UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SHANE VINCENT NIGRO,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>JAY CHRISTENSEN, BRIAN KLINGENSMITH, JACK FRASER, MATHEW LYTLE, JEFF ZMUDA, and SERGEANT BORG [CZUDAK],<br><br>　　　　　Defendants. | Case No. 1:19-cv-00441-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court in Plaintiff Shane Vincent Nigro's prisoner civil rights action are Defendants' Motion for Summary Judgment and Plaintiff's Motion for Clarification. Dkts. 20, 26. Having reviewed the parties' filings and the record in this matter, the Court finds that oral argument is unnecessary. Therefore, the Court will decide this matter on the written motions, briefs, and record without oral argument. D. Idaho L. Civ. R. 7.1(d).

Defendants assert that Plaintiff failed to exhaust his Idaho Department of Correction (IDOC) administrative remedies for the due process claims upon which he was authorized to proceed. They alternatively argue that Plaintiff has failed to state a claim upon which relief can be granted. For the reasons that follow, the Court enters the following Order granting the Motion for Summary Judgment in part on the state law liberty interest claim

and deferring ruling in part, pending further briefing, on the atypical and significant hardship claim.

## BACKGROUND

Plaintiff asserts that Defendants violated his constitutional right to due process under the Fourteenth Amendment. Plaintiff alleges that, on May 7, 2018, Defendants wrongfully labeled him a "sex offender," based on a disciplinary offense report (DOR) charge for which he asserts he was entitled to, but denied, due process protections. Plaintiff asserts that he was not allowed to present evidence in his defense, call witnesses, pay for and take a polygraph, view statements of the purported victim, or know any of the evidence used to find him guilty. He also asserts that he suffered atypical and significant hardships in administrative segregation after being found guilty.

## STANDARD OF LAW

1. **Summary Judgment**

Summary judgment is appropriate when a party can show that, as to a particular claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). Rather, there must be a *genuine* dispute as to a *material* fact essential to an important element of the cause of action or defense to survive summary judgment. Disputes over facts that are not material to the resolution of the motion will not preclude summary

judgment. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The Court does not decide the credibility of affiants or weigh the evidence set forth by the non-moving party. *Anderson*, 477 U.S. at 255. That means a party's or witness's sworn statement must be taken as true for purposes of summary judgment. The Court must also draw all reasonable inferences from circumstantial evidence in a light most favorable to the non-moving party, *T.W. Elec. Serv., Inc.*, 809 F.2d at 630-31, but it is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1207-088 (9th Cir. 1988) (observing that *Matsushita Electric Industrial Company v. Zenith Radio Corporation*, 475 U.S. 574 (1986), "authorizes an inquiry on summary judgment into the 'implausibility' of inferences from circumstantial evidence, [but] not an inquiry into the credibility of direct evidence").

The moving party is entitled to summary judgment if that party shows that each material fact cannot be disputed. To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A) & (B). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

If the moving party meets its initial responsibility, then the burden shifts to the opposing party to establish that a genuine dispute as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The existence of a scintilla of evidence in support of the non-moving party's position is insufficient.

Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

"If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," or if a litigant needs more time to obtain declarations or do discovery, the Court may "give an opportunity to properly support or address the fact," "defer considering the motion nor deny it," or "issue any other appropriate order." Fed. R. Civ. P. 56(d)-(e).

### 2. Procedural Due Process

The Due Process Clause of the Fourteenth Amendment prohibits the government from depriving an individual of a liberty or property interest without following the proper procedures for doing so. *See, e.g., Wolff v. McDonnell*, 418 U.S. 539, 558 66 (1974).[1] To succeed on a procedural due process claim, a prisoner must establish (1) that he possessed a liberty interest and (2) that the defendants deprived him of that interest as a result of insufficient process. *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005).

### A.   *State-Created Liberty Interest*

The United States Supreme Court has held that protected liberty interests may arise from state laws. *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989). For example, in *Neal v. Shimoda*, 131 F.3d 818, 830 (9th Cir. 1997), the United States Court

---

[1] The minimum procedural protections prison officials must provide a prisoner facing disciplinary charges are: (1) written notice of the charges before the disciplinary hearing; (2) at least 24 hours to allow the prisoner to prepare for the hearing; (3) the right to call witnesses and present documentary evidence, unless doing so would be unduly hazardous to institutional safety or correctional goals; (4) assistance from another prisoner or staff person where the issues presented are complex or the prisoner is illiterate; and (5) a written statement by the factfinders detailing the evidence relied upon and the reasons for the disciplinary action; *See id.* at 564-70.

of Appeals for the Ninth Circuit held that a liberty interest arose from the following state law:

> Hawaii's statute creating the [Sex Offender Treatment Program] authorizes correctional officials to classify certain inmates as sex offenders without a hearing and mandates their completion of an extensive treatment program, which includes their confession to past sex offenses, as a precondition to parole eligibility.

*Id*. at 828-29. In particular, the Court of Appeals identified the liberty interest at stake in *Neal* as "the stigmatizing consequences of the attachment of the 'sex offender' label coupled with the subjection of the targeted inmate to a mandatory treatment program whose successful completion is a precondition for parole eligibility." *Id*. at 830. The Ninth Circuit Court held that this combination of government-imposed deprivations of liberty requires procedural protections. *Id*. at 830.

### B. *Atypical and Significant Hardship*

Typically, prison segregation housing "in and of itself does not implicate a protected liberty interest." *Serrano v. Francis*, 345 F.3d 1071, 1078 (9th Cir. 2003) (collecting cases). Rather, a liberty interest arises only if the conditions of segregation impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484.

To determine whether segregation poses an atypical and significant hardship, courts must conduct a "case by case, fact by fact" analysis of the "condition or combination of conditions or factors" that the plaintiff experienced. *Serrano*, 345 F.3d at 1078 (citing *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996)). That analysis includes:

(1) if disciplinary, whether that segregation was essentially the same as discretionary forms of segregation, such as administrative segregation; (2) whether a comparison between the plaintiff's confinement and conditions in the general population showed that the plaintiff suffered no "major disruption in his environment"; and (3) whether the length of the plaintiff's sentence was affected. *Sandin*, 515 U.S. at 486-87; *see also Resnick v. Hayes*, 213 F.3d 443, 448 (9th Cir. 2000) (clarifying that, to prevail, a prisoner must establish a liberty interest, showing "that his confinement, *whether administrative or disciplinary*, presented "the type of atypical, significant deprivation [that] might conceivably create a liberty interest" (emphasis added).

In *Wilkinson v. Austin*, 545 U.S. 209 (2005), the United States Supreme Court identified a set of conditions that met the "atypical and significant hardship" standard:

> For an inmate placed in OSP, almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room. Save perhaps for the especially severe limitations on all human contact, these conditions likely would apply to most solitary confinement facilities, but here there are two added components. First is the duration. Unlike the 30–day placement in *Sandin*, placement at OSP is indefinite and, after an initial 30–day review, is reviewed just annually. Second is that placement disqualifies an otherwise eligible inmate for parole consideration. While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context. It follows that respondents have a liberty interest in avoiding assignment to OSP.

*Id*. at 223-24 (citations omitted).

It is now fifteen years post-*Wilkinson v. Austin*. In reviewing a claim "case by case" and "fact by fact," courts must remain mindful of modern-day research documenting the serious effects solitary confinement can have on prisoners. In 2018, Dr. Craig Haney, Distinguished Professor of Psychology, University of California, Santa Cruz, observed:

> Largely because of the robustness and theoretical underpinnings of the data, numerous scientific and professional organizations have reached a broad consensus about the damaging effects of solitary confinement.... The American Psychological Association (2016, p. 1), the world's largest professional association of psychologists, asserted that "solitary confinement is associated with severe harm to physical and mental health among both youth and adults, including: increased risk of self-mutilation, and suicidal ideation; greater anxiety, depression, sleep disturbance, paranoia, and aggression; exacerbation of the onset of pre-existing mental illness and trauma symptoms; [and] increased risk of cardiovascular problems."

Craig Haney, *The Psychological Effects of Solitary Confinement: A Systematic Critique*, 47 Crime & Just. 365, 368 (2018).

Though no recent United States Supreme Court opinion has squarely addressed solitary confinement, several Justices have written concerning it. *See Apodaca v. Raemisch*, 139 S.Ct. 5 (2018) (Sotomayor, J., issuing a statement respecting the denial of certiorari ("Courts and corrections officials must accordingly remain alert to the clear constitutional problems raised by keeping prisoners like Apodaca, Vigil, and Lowe in "near-total isolation" from the living world ... in what comes perilously close to a penal tomb."). *See Ruiz v. Texas*, 137 S.Ct. 1246 (2017) (Breyer, J., dissenting from denial of stay of execution) ("If extended solitary confinement alone raises serious constitutional questions, then 20 years of solitary confinement, all the while under threat of execution, must raise similar questions, and to a rare degree, and with particular intensity."); *Davis v. Ayala*, 576

MEMORANDUM DECISION AND ORDER - 7

U.S. 257 (2015) (Kennedy, J., concurring) ("Of course, prison officials must have discretion to decide that in some instances temporary, solitary confinement is a useful or necessary means to impose discipline and to protect prison employees and other inmates. But research still confirms what this Court suggested over a century ago: Years on end of near-total isolation exact a terrible price.").

Many prisons have changed the policies and procedures governing solitary confinement units based upon such research. As noted above, the particular facts of a prisoner's segregation must be taken into account in a court's "atypical and significant hardship" analysis.

"Administrative segregation" is a catch-all phrase for any form of non-punitive segregation. For example, prisoners may be segregated to protect them from other prisoners; to protect other prisoners from the segregated prisoner; or pending investigation of disciplinary charges, transfer, or re-classification. *See Hewitt*, 459 U.S. at 468. An example of a legitimate administrative ground for placement and retention in segregated housing is gang validation, which is not considered a punitive decision. *See Bruce v. Ylst*, 351 F.3d 1283, 1287 (9th Cir. 2003). "It is plain that the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." *Hewitt*, 459 U.S. at 468.

In *Hewitt*, the United States Supreme Court held that a lesser quantum of process than the *Wolff* procedures is due when a prisoner is placed in *administrative* segregation than when a prisoner is placed in *disciplinary* segregation. *See Toussaint v. McCarthy*, 801 F.2d 1080, 1099 (9th Cir. 1986) ("*Toussaint I*"), *abrogated in part on other grounds by*

MEMORANDUM DECISION AND ORDER - 8

*Sandin v. Conner*. The process due for initial placement in administrative segregation is as follows: (1) "an informal nonadversary hearing" must be held "within a reasonable time after the prisoner is segregated"; (2) the prisoner must be informed of the charges against him or of the prison officials' "reasons for considering segregation"; and (3) the prisoner must be allowed "to present his views to the prison official charged with deciding whether to transfer him to administrative segregation." *Toussaint I*, 801 F.2d at 1101. In such instances, a prisoner ordinarily is limited to presenting his views in a written statement, although prison administrators may permit oral presentations in cases where they believe a written statement would be ineffective. *Hewitt*, 459 U.S. at 476.

An "ad-seg" prisoner is *not* entitled to: (1) detailed written notice of charges; (2) representation by counsel or counsel-substitute; (3) an opportunity to present witnesses; (4) an opportunity to cross-examine witnesses; (5) a written decision describing the reasons for placing the prisoner in administrative segregation; or (6) disclosure of the identity of confidential informants providing information leading to the placement of the prisoner in administrative segregation. *Toussaint I*, 801 F.2d at 1100–01 (citations omitted); *Wolff*, 418 U.S. at 567–68; *Walker v. Sumner*, 14 F.3d 1415, 1420 (9th Cir. 1994), *overruled on other grounds by Sandin v. Conner*.

In administrative segregation decisionmaking, prison officials may rely mainly on subjective factors because of the security reasons behind such segregation:

> In assessing the seriousness of a threat to institutional security, prison administrators necessarily draw on more than specific facts surrounding a particular incident; instead, they must consider the character of the inmates confined in the institution, recent and longstanding relations between

MEMORANDUM DECISION AND ORDER - 9

> prisoners and guards, prisoners inter se, and the like. In the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of other prisoners and guards even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous incidents. The judgment of prison officials in this context, like that of those making parole decisions, turns largely on purely subjective evaluations and on predictions of future behavior; indeed, the administrators must predict not just one inmate's future actions, as in parole, but those of an entire institution.

*Toussaint I*, 801 F.2d at 1100 (citing *Hewitt*, 459 U.S. at 474).

The process due for retaining a prisoner in administrative segregation is that prison officials must conduct a periodic review of the segregation decision, but the intervals at which that review occurs is at the discretion of prison officials. *Toussaint v. McCarthy*, 926 F.2d 800, 803 (9th Cir. 1990), *cert. denied*, 502 U.S. 874 (1991) ("*Toussaint II* "). The United States Court of Appeals for the Ninth Circuit has upheld periodic reviews occurring every 120 days as comporting with due process. *Id*. Again, due process for periodic reviews does *not* require a detailed written notice of the charges, representation by counsel or other inmates, or an opportunity to present witnesses, or a hearing. *Toussaint I*, 801 F.2d at 1100–01.

**UNDISPUTED MATERIAL FACTS**

On May 7, 2018, Plaintiff was found guilty of a Disciplinary Offense Report (DOR) for an attack on another inmate based in part on allegations that Plaintiff put his exposed penis on another inmate's face and demanded oral sex while two other inmates restrained the victim. *See* Dkts. 24-1, p. 15; 20-4, pp. 6-7. While Plaintiff disputes that he was involved in the incident at all, that dispute is not material; rather, it is undisputed that he

MEMORANDUM DECISION AND ORDER - 10

was found guilty—and that is what is at issue in Plaintiff's claims. The DOR guilt finding, along with a description of the sexual nature of the incident, is now a permanent part of Plaintiff's prison file. The incident description is included in four separate places in the prison's inmate file summary commonly called "C-Notes." *See* Dkt. 20-4, pp. 8-25. All IDOC employees in prisoner relations have access to the C-Notes. Plaintiff asserts he was not afforded *Wolff* procedural protections on his DOR prior to the guilty finding that now permeates his prison records.

Neither the state of Idaho nor the IDOC has formally identified Plaintiff as a "sex offender." Rather, that is done only when a prisoner has been convicted in a court of law of a sex offense as defined in the Idaho Code. Dkt. 24, ¶ 4, Decl. of Jay Christensen. In Plaintiff's C-Notes entered after the May 7, 2018 DOR, Plaintiff's restrictive housing reviews indicate that he is *not* a "sex offender." *Id*., ¶ 7. Under the "Case Management" section of each housing review, the word "No" is written next to the phrase "sex offender," which indicates that Plaintiff is not classified as a sex offender. *Id*.

Plaintiff stands convicted of illegal possession of a weapon and escape.[2] Plaintiff has not been convicted of a crime that qualifies as a sex offense. Nor has he shown that he has been required to register on a state sex offender website or has been subjected to mandatory sex offender treatment.

## ALLEGATIONS WITHOUT ADQUATE SUPPORT

It appears that Plaintiff was placed in, or remained in, administrative segregation

---

[2] *See* https://www.idoc.idaho.gov/content/prisons/offender_search/detail/83024.

after the DOR guilt finding. *See* Dkt 20-4. He asserts that he was denied parole and excluded from almost all human contact as a result of the DOR finding of guilt. Dkt. 3, p. 8. However, these allegations need documentation and additional factual details before the Court can consider them.

## DISCUSSION

The Court presently will bypass the administrative exhaustion procedural issue and focus on the failure-to-state-a-claim issue. In the present case, Plaintiff has not pointed to a state statute or regulation under which he was "labeled" a sex offender, nor has he alleged that he was forced to attend mandatory sex offender treatment programs. While Plaintiff is correct that, in layman's terms, he has been found guilty of a sex-related DOR offense, he is incorrect that, as a legal term of art, he has been "labeled" a "sex offender," as in *Neal*.

Accordingly, this Court agrees with Defendants' position that Plaintiff has failed to show a liberty interest arising from state law because he has not been labeled a sex offender under the Idaho Code or any Idaho regulation, and that portion of Plaintiff's due process claim is subject to dismissal.

Plaintiff has asserted that he suffered an atypical and significant hardship as a result of his placement in administrative segregation after the DOR guilty finding. The record does not contain sufficient information to determine whether Plaintiff has stated a claim with these vague allegations. The Court will permit the parties to supplement their briefing on the Motion for Summary Judgment to show the conditions of administrative segregation and the length of time Plaintiff spent there and to briefly argue whether the *Sandin* and *Toussaint I* factors have been met. There is no liberty interest in parole in Idaho; thus,

denial of parole plays no role in the Court's analysis.[3]

Unless Plaintiff makes such a showing, he has not demonstrated a liberty interest, and, therefore, he cannot proceed further on any claims that he has been denied due process on his placement in administrative segregation.

## ORDER

**IT IS ORDERED:**

1. Defendants' Motion for Summary Judgment (Dkt. 20) is GRANTED in part as to the "sex offender label" due process claim.

2. Plaintiff's Motion for Clarification (Dkt. 26) is GRANTED in part, to the extent that Plaintiff and Defendants will be given further opportunity to brief the *Sandin* and *Toussaint I* issues and provide supporting exhibits, as follows: Defendant's supplement shall be due 21 days after entry of this Order, and Plaintiff's responsive supplement shall be due 21 days after Defendants file their supplement. Defendants may then file a reply within 14 days. Nothing further shall be filed after that time.

DATED: September 9, 2020

David C. Nye
Chief U.S. District Court Judge

---

[3] There is "no right under the Federal Constitution to be conditionally released before the expiration of a valid sentence, and the States are under no duty to offer parole to their prisoners." *See Swarthout v. Cooke*, 562 U.S. 216, 220 (2011); *Board of Pardons v. Allen*, 482 U.S. 369, 380-81 (1987). Therefore, an inmate can bring a procedural due process challenge to a parole denial decision only when there is a *state-created* liberty interest in parole. *Swarthout*, 562 U.S. at 220. In *Banks v. State of Idaho*, 920 P.2d 905 (Idaho 1996), the Idaho Supreme Court held that in Idaho "parole is not an automatic right or liberty interest." *Id*. at 908.