UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SEAN VINCENT NIGRO,<br><br>        Plaintiff,<br><br>    v.<br><br>JAY CHRISTENSEN, BRIAN KLINGENSMITH, JACK FRASER, MATHEW LYTLE, JEFF ZMUDA, and SERGEANT BORG [CZUDAK],<br><br>        Defendants. | Case No. 1:19-CV-00441-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

In this prisoner civil rights action filed by Plaintiff Shane Vincent Nigro, the Court previously considered Defendants' Motion for Summary Judgment, granting the motion in part on Petitioner's "sex offender label" due process claim and providing the parties with an opportunity to supplement their submissions on the remaining claim that Plaintiff was denied due process rights under *Wolff v. McDonnell*, 418 U.S. 539 (1974), when he was given a disciplinary offense report (DOR) on May 17, 2018, and not permitted to know the evidence used against him or present his own evidence supporting his innocence. Dkt. 3, pp. 8-14.

Defendants have filed their supplements, and Plaintiff has filed his supplement. Dkts. 32, 33, 34. Oral argument is unnecessary. Therefore, the remainder of the Motion for

Summary Judgment is ripe for adjudication.

## STANDARD OF LAW

The Due Process Clause of the Fourteenth Amendment prohibits the government from depriving an individual of a liberty or property interest without following the proper procedures for doing so. *See Wolff*, 418 U.S. at 558-66. To succeed on a procedural due process claim, a prison inmate must establish (1) that he possessed a liberty interest and (2) that the defendants deprived him of that interest by use of insufficient process. *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005).

The Due Process Clause does not create a liberty interest in remaining in the general population or being free from different types of segregation. *See Serrano v. Francis*, 345 F.3d 1071, 1078 (9th Cir. 2003) (citing *Sandin v. Conner*, 515 U.S. 472, 485-86 (1995)). Prison officials may assign any housing or enforce any sanctions that are within "the normal limits or range of custody which the conviction has authorized the State to impose." *Sandin*, 515 U.S. at 478 (citing *Meachum v. Fano*, 427 U.S. 215, 225 (1976)).

However, states may create a liberty interest by choosing to impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. Therefore, if an inmate's potential consequence for engaging in certain types of behavior could be a transfer to a housing assignment that constitutes an "atypical and significant hardship," then, before doing so, prison officials must provide the inmate with the *Wolff* minimum procedural protections. *Sandin*, 515 U.S. at 477-78 (citing *Wolff*, 418 U.S. at 554-58). The *Wolff* protections are: (1) written notice of the charges before the disciplinary hearing; (2) at least 24 hours to allow the prisoner to prepare for the

MEMORANDUM DECISION AND ORDER - 2

hearing; (3) the right to call witnesses and present documentary evidence, unless doing so would be unduly hazardous to institutional safety or correctional goals; (4) assistance from another prisoner or staff person where the issues presented are complex or the prisoner is illiterate; and (5) a written statement by the factfinders detailing the evidence relied upon and the reasons for the disciplinary action; *See* 418 U.S. at 564-70.

Due process for all types of disciplinary segregation demands only that the prison hearing officer's decision be supported by "some evidence," and that the evidence "have some indicia of reliability." *Superintendent v. Hill*, 472 U.S. 445, 455 (1985); *Toussaint v. McCarthy*, 801 F.2d 1080, 1105 (9th Cir. 1986) ("*Toussaint I*"), *abrogated in part on other grounds by Sandin v. Conner*. The "some evidence" standard is minimally stringent, and the relevant inquiry is whether "there is any evidence in the record that could support the conclusion reached." *Hill*, 472 U.S. at 455-56.

In the past, many inmate behavioral incidents result in "disciplinary segregation," but in the modern era, that trend has declined. Instead, a bad behavior of one inmate often triggers prison officials' duty to separate that inmate from others for purposes of institutional safety and order—which is an *administrative*, not a punitive, decision that results in "administrative segregation." For example, prisoners may be segregated to protect them from other prisoners; to protect other prisoners from the segregated prisoner; or pending investigation of disciplinary charges, transfer, or re-classification. *See Hewitt v. Helms*, 459 U.S. 460, 468 (1983), *overruled on other grounds by Sandin*, 515 U.S. at 472–73. An example of a legitimate administrative ground for placement and retention in segregated housing is gang validation, which is not considered a punitive decision. *See*

MEMORANDUM DECISION AND ORDER - 3

*Bruce v. Ylst*, 351 F.3d 1283, 1287 (9th Cir. 2003). "It is plain that the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." *Hewitt*, 459 U.S. at 468.

To determine whether any type of segregation poses an atypical and significant hardship, courts must conduct a "case by case, fact by fact" analysis of the "condition or combination of conditions or factors" that the plaintiff experienced. *Serrano*, 345 F.3d at 1078 (citing *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996)). A modern articulation of the *Sandin-Serrano* test for a liberty interest calls for a review of:

> (1) the extent of difference between segregation and general population; (2) the duration and intensity of the conditions [of] confinement; and (3) whether the sanction [invariably] extends the length of the prisoner's sentence.

*Cepero v. High Desert State Prison*, No. 3:12-cv-00263-MMD-VPC, 2015 WL 1308690 at *14 (D. Nev. Mar. 24, 2015) (parenthetical added from *Serrano*); *see Sandin*, 515 U.S. at 486–87; *Serrano*, 345 F.3d at 1078.

## DISCUSSION OF DISCIPLINARY OFFENSE
## REPORT DUE PROCESS CLAIM

### 1. Factual Background

While living in the protective custody unit at the Idaho State Correctional Center (ISCC or ICC), Plaintiff was accused of committing a battery and sexual abuse upon another inmate on April 14, 2018. The totality of evidence showed that—whether it was "horseplay" or had a sexual gratification motive—Plaintiff placed his genitalia on another

inmate's face while  two other inmates held the victim down. Dkt. 20-4, p. 6. The conclusion that Plaintiff engaged in this behavior was made by Correctional Officer Matthew Lytle, after conducting an investigation, including "multiple interviews" and reviewing "video evidence, housing records, [and] staff reports." Dkt. 34-3, p. 1.

Officer Lytle issued Plaintiff a disciplinary offense report (DOR) on May 7, 2019. *Id*. Hearing Officer Brian Klingensmith conducted a DOR hearing the next day. *See id*. Plaintiff was found guilty and given the following sanctions: 90 days' restriction on property, commissary, visitation, and telephones, and 30 days' restriction on recreation. *Id*. No housing restrictions were imposed as a sanction.

Plaintiff pursued administrative appeals of the DOR guilty finding. He argued on appeal that the hearing officer failed to review video and photographic evidence. Plaintiff asserted that there was no substantial evidence to show that he committed a sexual assault. Here, Plaintiff argues that he was not allowed to present evidence in his defense, call witnesses, pay for and take a polygraph, view statements of the purported victim, or know any of the evidence used to convict him, but Defendants say that he was permitted to be present and be heard at the hearing. Dkt. 33, pp. 1-2; Dkt. 34, p. 3. The DOR finding was upheld by Timothy McKay on administrative review and on final appeal by Warden Jay Christensen, who concluded: "A thorough investigation was completed, all evidence has been turned over to Ada County investigators to refer for charges for prosecution. Enough evidence was presented to constitute potential prosecution. DOR stands." Dkt. 34-3, p. 2. In addition, the record reflects: "One of the other assailants admitted that they did what the DOR [against them] was accusing them of." Dkt. 32-6, p. 2.

MEMORANDUM DECISION AND ORDER - 5

### 2.  Analysis

The sanction Plaintiff received for being found guilty of the DOR—the withdrawal of certain privileges for between 30 and 90s days—is an undisputed fact. Applying the law, to that fact, the Court concludes that Plaintiff did not have a liberty interest in retaining those privileges for that length of time. Therefore, Plaintiff may not maintain a civil rights cause of action based on the lack of due process procedures provided at the DOR hearing of May 8, 2018. Nor may Plaintiff maintain a claim that he was convicted without a shred of evidence. The records show that the DOR hearing officer relied on the investigation results from Officer Lytle, who himself relied on many different sources to come to the conclusion that Plaintiff engaged in the behavior set forth in the DOR. That meets the minimal "some evidence" standard. This claim will be dismissed with prejudice.

### DISCUSSION OF ADMINISTRATIVE
### SEGREGATION DUE PROCESS CLAIM

### 1.  Factual Background

Because Plaintiff's action involved, at the least, psychological harm to another inmate, and was Plaintiff's fortieth DOR for misbehavior, prison officials held a restrictive housing hearing on May 17, 2018, to determine whether Plaintiff should be returned to protective custody unit (which is the unit where he committed the assault) or placed in administrative custody to prevent him from harming other inmates. Dkt. 32-6, p. 2. Plaintiff was present and participated personally in the hearing to provide input for the committee "to determine whether administrative segregation was an appropriate placement." Dkt. 32, p. 2.  At that hearing, Plaintiff made the following statements: that  (1) prison officials

MEMORANDUM DECISION AND ORDER - 6

"should investigate the situation more because he states they are false accusations"; (2)

housing unit "G 4 is an absolute failure and no one will be successful there"; and (3) "he

doesn't care about placement in ad-seg and will just top out his sentence." Dkt. 32.6, p. 2.

Further documenting Plaintiff's presence at the meeting is this C-Note:

> On Thursday, May 17, 2018 I Officer Tello was in a Restrictive
> Housing Placement Committee hearing with Deputy Warden
> McKay, Case Manager Jones, and Officer White in A-block.
> After the hearing was over Officer White
> and I escorted Offender Nigro #83024 back to his cell. Once
> we secured the cell, Offender Nigro stated I am going to beat
> his ass. He also stated that he gets out in 3 years, and stated he
> was going to go to Deputy Warden McKay's house to beat his
> ass.

Dkt. 32-2, p. 20.

The summary of the restrictive housing committee report stated:

> Offender Nigro has been housed in Protective Custody
> since August 18, 2017. While house[d] in Protective Custody
> Offender Nigro has been identified as being involved in
> harassing both other offenders and staff. Since his
> incarceration he has received forty DOR's for his behaviors.
> Most recently he was involved in a mutual combat and the
> sexual abuse of another Offender.

Dkt. 34-2, p. 4. Based on the evidence in his record, Plaintiff was recommended for

placement "in Administrative Segregation for the safety of Staff and other Offenders." *Id.*,

p. 5.

As a result, on May 23, 2018, Plaintiff was moved from ICC/A Block 1 15 A

(protective custody) to ICC/A Block 1 22 A (administrative segregation). Dkt. 32-3, p. 3.

He remained in ICC administrative segregation for a few months. The following C-notes

were recorded in June and July, noting increases in Plaintiff's bad behavior:

MEMORANDUM DECISION AND ORDER - 7

06/04/2018 C-Note:                INCIDENTS Location: ICC
                                  Offender Nigro 83024 was notified that he was
                                  approved for Administrative Segregation. Nigro then
                                  broke his MP3 player and notified CCM Jones that he
                                  will be breaking one thing a day while in segregation.
                                  He said he will do whatever it takes to get to IMSI. Dkt.
                                  32-2, p. 19.


07/08/2018 C-Note:                HOUSING CONCERNS Location: ICC
                                  After 2 Offenders were sandbagged for 'fishing' in A-
                                  block; Offender Nigro was observed calling another
                                  Offender who resides in A-2 stating what I just did.
                                  Offender Nigro stated, "Really?!, I see how it is."
                                  Offender Nigro then stated to the offender in A-2, "This
                                  Cpl. thinks he can just do whatever he wants around
                                  here." Both the residing offender and Offender Nigro
                                  then started yelling and being belligerent. This is an
                                  example of Offender Nigro creating a disruption within
                                  the unit. My suggestion would be to move him to
                                  another area of the unit to where he can be more
                                  manageable. Dkt. 32-2, p. 18.

07/08/2018 C-Note:                INCIDENTS Location: ICC
                                  I, Cpl. Janoushek A901, talked to Offender Nigro about
                                  his behavior in A-block in regards to inciting other
                                  offenders in A-block when I hold them accountable
                                  with unit rules. I stated that if this behavior continues
                                  that I would move him to another area the unit. Offender
                                  Nigro then stated, " It sounds like you['re] threatening
                                  me." I told him I was not threatening you and stated his
                                  behavior is causing issues with other offenders within
                                  the unit. Offender Nigro stated that he had no idea what
                                  he was talking about.

                                  * see previous c-notes* Offender Nigro is continuously
                                  communicating to Offender [redacted] , [redacted] and
                                  Offender [redacted]. At one point had all 4 offenders
                                  covering their window. Ultimately compliance was
                                  made with uncovering the windows. Dkt. 32-2, pp. 18-
                                  19.

07/09/2018 C-Note:                INCIDENTS Location: ICC

MEMORANDUM DECISION AND ORDER - 8

> Offender Nigro is consistently causing trouble in A block. He threatens to cover his window up every time he doesn't get what he wants so that the LT will come down to see him any time he wants. He also encourages other offenders to cover windows as well as other anything else he can convince them to do in order to cause problems. He has been spoken to many times but continues to disregard what staff says. Dkt. 32-2, p. 18.

07/10/2018 C-Note:     INCIDENTS Location: ICC
> When Offender Nigro was informed that he would be moving, he completely trashed his cell including throwing toilet paper all over, trash covering the floor, ripped up food spread throughout the cell, and toilet stuffed with trash. Dkt. 32-2, p. 18.

On July 10, 2018, Plaintiff was moved from ICC/A Block 1 22 A to ISCI/Unit 08 A 14. 32-3, p. 3. On July 30, 2018, Plaintiff's case manager went to Unit 8 to meet with Plaintiff. However, Plaintiff refused to come out and meet with the case manager. Dkt. 32-2, p. 18. On August 28. 2018, Plaintiff was transferred to the more restrictive Idaho Maximum Security Institution (IMSI) administrative segregation unit. Dkt. 32-3, p. 3.

Assuming that Plaintiff had a liberty interest in not being placed in administrative segregation at the maximum security prison, where the conditions of confinement are significantly harsher than administrative segregation at the medium security prisons, the Court must review whether he had all the process he was due. In *Hewitt*, the United States Supreme Court held that a lesser quantum of process than the *Wolff* procedures is due when a prisoner is placed in *administrative* segregation than when a prisoner is placed in *disciplinary* segregation. *See Toussaint I*, 801 F.2d at 1099. When an inmate has established a protected liberty interest in freedom from administrative segregation, federal

due process requires only the following procedures for *initial placement* in administrative segregation: (1) "an informal nonadversary hearing" must be held "within a reasonable time after the prisoner is segregated"; (2) the prisoner must be informed of the charges against him or of the prison officials' "reasons for considering segregation"; and (3) the prisoner must be allowed "to present his views to the prison official charged with deciding whether to transfer him to administrative segregation." *Id.* at 1101. In such instances, a prisoner ordinarily is limited to presenting his views in a written statement, although prison administrators may permit oral presentations in cases where they believe a written statement would be ineffective. *Hewitt*, 459 U.S. at 476.

An "ad-seg" prisoner is *not* entitled to: (1) detailed written notice of charges; (2) representation by counsel or counsel-substitute; (3) an opportunity to present witnesses; (4) an opportunity to cross-examine witnesses; (5) a written decision describing the reasons for placing the prisoner in administrative segregation; or (6) disclosure of the identity of confidential informants providing information leading to the placement of the prisoner in administrative segregation. *Toussaint I*, 801 F.2d at 1100–01 (citations omitted); *Wolff*, 418 U.S. at 567–68; *Walker v. Sumner*, 14 F.3d 1415, 1420 (9th Cir. 1994), *overruled on other grounds by Sandin v. Conner*.

In administrative segregation decisionmaking, prison officials may rely mainly on subjective factors because of the security reasons behind such segregation:

> In assessing the seriousness of a threat to institutional security, prison administrators necessarily draw on more than specific facts surrounding a particular incident; instead, they must consider the character of the inmates confined in the institution, recent and longstanding relations between

MEMORANDUM DECISION AND ORDER - 10

> prisoners and guards, prisoners inter se, and the like. In the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of other prisoners and guards even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous incidents. The judgment of prison officials in this context, like that of those making parole decisions, turns largely on purely subjective evaluations and on predictions of future behavior; indeed, the administrators must predict not just one inmate's future actions, as in parole, but those of an entire institution.

*Toussaint I*, 801 F.2d at 1100 (citing *Hewitt*, 459 U.S. at 474).

The due process required for *retaining* a prisoner in administrative segregation after placement there is that prison officials must conduct a periodic review of the segregation decision, but the intervals at which that review occurs is at the discretion of prison officials. *Toussaint v. McCarthy*, 926 F.2d 800, 803 (9th Cir. 1990), *cert. denied*, 502 U.S. 874 (1991) ("*Toussaint II* "). The United States Court of Appeals for the Ninth Circuit has upheld periodic reviews occurring every 120 days as comporting with due process. *Id*. Again, due process for periodic reviews does *not* require a detailed written notice of the charges, representation by counsel or other inmates, an opportunity to present witnesses, or a hearing. *Toussaint I*, 801 F.2d at 1100–01. Further, allegations that prison regulations were not followed during segregation determination proceedings, without more, do not equate to a due process violation.

### 2.  Analysis

The undisputed facts show that Plaintiff attended the restrictive housing placement hearing on May 17, 2018, which was held *before* he was moved into administrative segregation. He was informed why he was being considered for administrative segregation,

MEMORANDUM DECISION AND ORDER - 11

including the recent assault charge and his forty DORs. Plaintiff was permitted to share his views at the hearing, as set forth above, including his view that placement in Unit G 4 does not successfully reform inmates' behavior. Based upon the record, prison officials provided Plaintiff with all the process he was due.

### 3.  Allegations beyond the Scope of the Complaint

Plaintiff's Complaint challenges only the May 17, 2018 hearing, after which he was placed in administrative segregation at the medium security facility for several months, until his additional bad behavior warranted a change. He has not challenged the later decisions of prison officials to move him to more restrictive administrative segregation at the maximum security prison after he repeatedly disrupted the ISCC administrative housing unit, including inciting other inmates to break rules designed for safety and security (such as the covering of cell windows). Therefore, Plaintiff's assertions that the conditions of confinement at IMSI were inhumane[1] are not before this Court and will not be addressed here.

It does not appear that Plaintiff's entire stay at IMSI (between August of 2018 and

-------------------------------------------

[1]Plaintiff says that he was "denied almost all human contact" in administrative segregation at IMSI. The warden says that inmates are not permitted to "to have each other in eye sight while speaking." Dkt. 34-1, p. 2. Plaintiff says it is extremely difficult to talk to other inmates because the cells are solid concrete with a solid metal door that has only a small window. If inmates lie on the floor, they can talk to other inmates through the ventilation system, but they do not know who they are talking to. While it is possible to talk to other inmates while being moved in restraints from a cell to the showers or recreation, such contact or communication is very limited or sometimes prohibited by the correctional officers involved in the inmate movements.

At IMSI, Plaintiff says he was kept in his cell for 23 hours a day, except when he was permitted to exercise outdoors in an outdoor metal enclosure like a "dog cage." Dkt. 33, p. 2; 34-1, p. 2. Plaintiff was escorted to the showers three times per week. There are no showers or recreation on the weekends; inmates spend their weekends entirely in their cells. *See* Dkt. 33, 33-1.

February of 2020) was in the administrative segregation unit. It seems that sometimes he

may have been housed in the general population there; however, that is unclear. *See* Dkt.

32-3, pp. 2-3.

In *Brown v. Oregon Department of Corrections*, while Inmate Brown was housed

in the IMU administrative segregation unit for 27 months, he "submitted eight petitions to

prison officials requesting review of his classification status. Those requests were denied,

and Brown was not afforded a review of his classification status until the eve of his eventual

release from the IMU." 751 F.3d 983, 986 (9th Cir. 2014). The Ninth Circuit Court of

Appeals observed that the longer an inmate is housed in a unit where there is very little

human contact, the more it edges toward an atypical and significant hardship, requiring

meaningful periodic review hearings:

> [W]e need not locate the appropriate baseline here
> because Brown's twenty-seven month confinement in the IMU
> imposed an atypical and significant hardship under any
> plausible baseline. Confinement in the IMU subjected Brown
> to solitary confinement for over twenty-three hours each day
> with almost no interpersonal contact, and denied him most
> privileges afforded inmates in the general population. While
> these conditions alone might apply to most solitary-
> confinement facilities, here there is a crucial factor
> distinguishing confinement in the IMU: the duration of
> Brown's confinement. *See Hutto v. Finney*, 437 U.S. 678, 686,
> 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) ("[T]he length of
> confinement cannot be ignored in deciding whether the
> confinement meets constitutional standards.").... Brown's
> conditions of confinement in the IMU thus implicate a
> protected liberty interest under any plausible baseline.

*Id*. at 987.

Here, the record reflects that Plaintiff was provided with periodic review hearings

MEMORANDUM DECISION AND ORDER - 13

at regular intervals during his confinement in segregation that was essentially solitary for 23 hours a day. *See* Dkt. 32-1. Again, the issues beyond initial placement in ISCC administrative segregation are not before the Court. Plaintiff is now residing in a medium-security facility, and he will attain his full-term prison release date on April 7, 2021.

## CONCLUSION

For the reasons explained above, in light of the undisputed facts, Plaintiff cannot establish a denial of due process. Therefore, Defendants are entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56.

## ORDER

**IT IS ORDERED:**

1. Defendants' Motion for Extension of Time (Dkt. 30) is GRANTED.

2. Defendants' Motion for Summary Judgment (Dkt. 20) is GRANTED in full.

3. This entire case is DISMISSED with prejudice.

DATED: February 1, 2021

David C. Nye
Chief U.S. District Court Judge